## A10A0913. FULTON COUNTY v. T-MOBILE SOUTH, LLC.
### (699 SE2d 802)

MIKELL, Judge.

In this case of first impression, we hold that a "9-1-1 charge" imposed by Fulton County (the "County") on wireless telephone service providers pursuant to the Georgia Emergency Telephone Number 9-1-1 Service Act of 1977[1] (the "Act") is a "tax." Furthermore, because appellee T-Mobile South, LLC's predecessor in interest, PowerTel Atlanta, Inc., erroneously paid $101,618.66 to the County in connection with its prepaid wireless customers from June 2003 through May 2005 (the "Refund Period"), we hold that T-Mobile may obtain a refund of that sum pursuant to OCGA § 48-5-380. Accordingly, we affirm the trial court's grant of summary judgment to T-Mobile in its action against the County[2] for a refund of taxes.

Certain relevant facts are undisputed. During the Refund Period, the Act authorized local governments "to adopt a resolution to impose a monthly wireless enhanced '[9-1-1]' charge upon each wireless telecommunications connection subscribed to by telephone subscribers whose billing address is within the geographic area that is served by the local government."[3] In accordance therewith, the County adopted a resolution authorizing it to impose a wireless

---

[1] OCGA § 46-5-120 et seq.

[2] The Fulton County commissioners also were sued, in their official capacities, but they are not parties to this appeal.

[3] OCGA § 46-5-133 (a) (1999). In 2007, this Code section was amended to add the phrase

enhanced 9-1-1 charge beginning February 1, 1999, upon wireless telecommunications providers, such as T-Mobile. The resolution allowed the County to collect $1 per month per wireless connection provided to each "telephone subscriber."[4]

The Act defines "telephone subscriber" as "a person or entity to whom local exchange telephone service or wireless service . . . is provided and in return for which the person or entity is billed on a monthly basis."[5] The "service supplier,"[6] such as T-Mobile, is required to collect the 9-1-1 charge from its "telephone subscriber" and remit the money to the local government.[7] T-Mobile, however, does not send monthly bills to those who purchase "prepaid" wireless service, because those customers pay in full for all of their minutes at the point of sale. Therefore, T-Mobile was not required to remit 9-1-1 charges for those customers.

On October 16, 2006, T-Mobile filed a claim for a refund with the County, asserting that the 9-1-1 charges were "taxes" under Georgia law; that it had paid a total of $947,433.92 in such charges during the Refund Period for its County customers; that $101,618.66 of that amount was paid on behalf of the prepaid customers; and that it was entitled to a refund of $101,618.66. Fulton County denied the claim, and T-Mobile brought the underlying action for a refund pursuant to OCGA § 48-5-380.[8] In the complaint, T-Mobile asserted that it did not collect any of the $101,618.66 from prepaid customers but paid that sum out of its own funds instead.

The County filed a motion to dismiss the action. The trial court denied the motion, ruling that the 9-1-1 charge was a tax and that

---

"other than a connection for prepaid wireless service," clarifying that local governments were not authorized to impose a 9-1-1 charge for prepaid wireless connections. Ga. L. 2007, p. 318, § 2. In 2005, "911" was changed to "9-1-1" throughout the Act. Ga. L. 2005, p. 660, § 9.

[4] The charge increased in January 2005, from $1 to $1.50 per month per wireless connection.

[5] OCGA § 46-5-122 (10) (1999).

[6] OCGA § 46-5-122 (9) (1999).

[7] See OCGA § 46-5-134 (a) (1) (1999):

The subscriber of an exchange access facility may be billed for the monthly "911" charge, if any, imposed with respect to that facility by the service supplier. Such "911" charge may not exceed $1.50 per month per exchange access facility provided to the telephone subscriber. . . . Each service supplier shall, on behalf of the local government, collect the "911" charge from those telephone subscribers to whom it provides exchange telephone service in the area served by the emergency "911" system.

[8] OCGA § 48-5-380 (b) provides, in pertinent part:

In any case in which it is determined that an erroneous or illegal collection of any tax . . . has been made by a county . . . or that a taxpayer has voluntarily or involuntarily overpaid any tax . . . , the taxpayer from whom the tax . . . was collected may file a claim for a refund with the governing authority of the county or municipality at any time within . . . three years after the date of the payment of the tax . . . to the county or municipality. . . .

the court had jurisdiction pursuant to OCGA § 48-5-380.[9] The parties filed cross-motions for summary judgment. The trial court granted T-Mobile's motion and denied Fulton County's motion, ruling that the Act did not impose 9-1-1 charges with respect to T-Mobile's prepaid customers during the Refund Period; that such charges were "taxes" for the purpose of OCGA § 48-5-380; and that T-Mobile was entitled to a refund of the amount paid on behalf of prepaid customers, or $101,618.66, plus prejudgment interest.

The County appeals. It concedes that the Act did not require T-Mobile to pay 9-1-1 charges on behalf of prepaid customers during the Refund Period. However, the County argues that the trial court erred in denying its motion for summary judgment and in granting T-Mobile's motion because (1) the charges are not taxes; (2) the refund claim is barred by the voluntary payment doctrine; and (3) T-Mobile did not adequately prove the amount that it claimed it paid on behalf of the prepaid customers. We disagree with these contentions and affirm.

1. Initially, we address T-Mobile's motion to dismiss this direct appeal. T-Mobile argues that we do not have jurisdiction because the County was required to follow the discretionary appeal procedure pursuant to OCGA § 5-6-35, which provides, in relevant part, that "[a]ppeals from decisions of the superior courts reviewing decisions of . . . state and local administrative agencies" shall be taken by application.[10] T-Mobile contends that, in denying its refund request, the County performed "the function of an administrative agency," so that it was required to file an application for appeal from the superior court's "review" of the County's decision. OCGA § 5-6-35, however, does not encompass the County's decision under the facts of this case. "The clear intent of OCGA § 5-6-35 was to give the appellate courts the discretion not to entertain an appeal where the superior court had reviewed a decision of certain specified lower tribunals (i.e., two tribunals had already adjudicated the case)."[11] Although the statute "applies to appeals of local governmental department decisions,"[12] in this case, no department rendered a

---

[9] See OCGA § 48-5-380 (c): "Any taxpayer whose claim for refund is denied by the governing authority of the county . . . shall have the right to bring an action for a refund in the superior court of the county in which the claim arises."

[10] OCGA § 5-6-35 (a) (1), (b).

[11] (Citation and punctuation omitted.) *Ladzinske v. Allen*, 280 Ga. 264, 265 (626 SE2d 83) (2006).

[12] (Citation omitted.) *Dunlap v. City of Atlanta*, 272 Ga. 523, 524 (531 SE2d 702) (2000). See *Consolidated Govt. of Columbus v. Barwick*, 274 Ga. 176, 177 (1) (549 SE2d 73) (2001) (petitions for certiorari and mandamus sought review of city's decision not to renew alcoholic beverage license and superior court, in ruling on such petitions, reviewed the decision of a local administrative agency; thus, application for discretionary appeal was required).

decision that was "reviewed" by the superior court. When T-Mobile requested a refund of the 9-1-1 charges, the County attorney simply responded by letter that the claim was not cognizable under OCGA § 48-5-380. The matter was never submitted to any administrative agency.[13] The superior court's order makes no reference to any "decision" issued by the County and did not "review" any such decision. Accordingly, this appeal does not fall within the ambit of OCGA § 5-6-35, and the County was not required to file an application for discretionary appeal. The County properly filed a direct appeal from the court's final order granting summary judgment to T-Mobile.[14] The motion to dismiss is denied.

2. The dispositive issue in this case is whether the "9-1-1 charge" authorized by the Act is properly classified as a "tax" under Georgia law. This is a question of first impression in this state, and our Supreme Court precedents guide our analysis.

In *Gunby v. Yates*,[15] the Court defined a "tax" as "an enforced contribution exacted pursuant to legislative authority for the purpose of raising revenue to be used for public or governmental purposes, and not as payment for a special privilege or a service rendered."[16] The Court distinguished a tax from a "fee," which it defined as "a charge fixed by law as compensation" for services rendered.[17] The Court held that the collection of one dollar for each marriage license sold in the state, in addition to the regular license fee, to be allocated to the probate judges' retirement fund, "was not for the purpose of compensating the ordinary for a service rendered, but was for the purpose of raising revenue for the expenses of operating the retirement board and paying benefits to retired ordinaries," and was thus an unconstitutional tax.[18]

In *Luke v. Dept. of Natural Resources*,[19] the Court relied on *Gunby* in ruling that fees paid by the owner and operator of an underground storage tank (UST) used in the retail gasoline business for participation in a UST Trust Fund did not constitute a tax

---

[13] Cf. *Chatham County Bd. of Tax Assessors v. Emmoth*, 278 Ga. 144, 146, n. 3 (598 SE2d 495) (2004) (cases involving ad valorem taxes are excepted from appeal by application by OCGA § 5-6-35 (a) (1), even though they involve appeals from the decision of the superior court reviewing the decision of an administrative body).

[14] *Studdard v. Satcher, Chick, Kapfer, Inc.*, 217 Ga. App. 1, 2 (456 SE2d 71) (1995) (direct appeals may be taken from orders granting summary judgment); see OCGA § 5-6-34 (a) (1), permitting appeals from "final judgments" entered by the superior courts; OCGA § 9-11-56 (h), governing appeals from orders granting or denying summary judgment.

[15] 214 Ga. 17, 19 (102 SE2d 548) (1958).

[16] (Citations omitted.) Id. at 19.

[17] Id.

[18] Id. at 20.

[19] 270 Ga. 647 (513 SE2d 728) (1999).

because they were not "exacted"; rather, the owner's participation in the Fund was voluntary.[20]

In *Levetan v. Lanier Worldwide*,[21] the Court held that sanitation assessments for garbage collection and disposal are not taxes but are services for which a fee is charged.[22] The Court rejected the trial court's ruling that the county was required to collect the fee through the tax commissioner's office, holding that the county was free, pursuant to its constitutional home rule powers, to require its finance department to collect the assessments.[23]

Finally, in *McLeod v. Columbia County*,[24] the Court determined that a monthly stormwater utility charge assessed against owners of developed property within a designated area based on the amount of impervious surface area located on their property was a fee and not a tax.[25] The Court cited *Gunby*'s definition of a tax and emphasized the following factors in reaching its conclusion: the charge was voluntary; the properties charged received a special benefit not received by others; and, unlike a tax, the charge was not imposed upon undeveloped property owners, "who neither significantly contributed to nor caused" the stormwater drainage problems underlying the charge.[26]

Supreme Court of Georgia precedents, as well as opinions from other jurisdictions that have considered this issue, lead us to conclude that the 9-1-1 charge is a tax. As noted above, the first part of the definition of a tax is "an enforced contribution exacted pursuant to legislative authority."[27] The County concedes that the charge is not voluntary,[28] as it is "exacted" pursuant to the Act and the County resolution. Accordingly, the first part of the test is satisfied.

The remainder of the test requires that we consider the function of the 9-1-1 charge; whether it is imposed "for the purpose of raising revenue to be used for public or governmental purposes, and not as

---

[20] Id. at 648 (1).

[21] 265 Ga. 323 (454 SE2d 504) (1995).

[22] Id. at 324 (2). Accord *Mayor &c. of Milledgeville v. Green*, 221 Ga. 498, 501 (145 SE2d 507) (1965) (charges for removing and disposing of garbage are merely a fee for special services); *Monticello, Ltd. v. City of Atlanta*, 231 Ga. App. 382, 385 (1) (499 SE2d 157) (1998) (same).

[23] *Levetan*, supra at 325 (2).

[24] 278 Ga. 242 (599 SE2d 152) (2004).

[25] Id. at 245 (2).

[26] Id. at 244-245 (2).

[27] *Gunby*, supra at 19.

[28] *Luke*, supra at 648 (1) ("A tax is not dependent on the will or assent of the person taxed") (citation omitted). See also OCGA § 46-5-122 (11), defining the 9-1-1 charge as "a *contribution* to the local government" for various costs related to operating and maintaining the 9-1-1 system. (Emphasis supplied.)

payment for a special privilege or a service rendered."[29] An examination of the Act reveals that the purpose of the 9-1-1 charge is to raise revenue "for public or governmental purposes." In passing the Act, the General Assembly declared its intent

> to establish and implement a cohesive state-wide emergency telephone number 9-1-1 system which will provide citizens with rapid, direct access to public safety agencies by dialing telephone number 9-1-1 with the objective of reducing the response time to situations requiring law enforcement, fire, medical, rescue, and other emergency services.[30]

The General Assembly also declared that, "in the public interest that users of wireless telephones should bear some of the cost of providing this life-saving service, as users of landline telephones currently do."[31] Both the "9-1-1 charge" and the "wireless enhanced 9-1-1 charge" are defined as "contributions to the local government" for various costs associated with the 9-1-1 system.[32] Thus, the purpose of the charge is to fund, i.e., raise revenue for, the 9-1-1 system, not as compensation for the service rendered by it.

We also must consider, as did the Supreme Court in *McLeod*, whether those upon whom the charge is imposed receive a special benefit not received by others.[33] As explained by the Florida Supreme Court, "[user] fees share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner not shared by other members of society."[34] The property owners who paid the stormwater utility charges in *McLeod*[35] and the sanitation assessments in *Levetan*[36] received specific benefits not received by others. Here, those who pay the 9-1-1 charge — whether T-Mobile or its customers — receive no benefit not received by the general public, because all members of the public may access the 9-1-1 system. As such, the charge is a tax.

This "public benefit" factor led a New York appeals court to rule that a monthly surcharge imposed by a county on wireless tele-

---

[29] (Citation and punctuation omitted.) *McLeod*, supra at 244 (2).

[30] OCGA § 46-5-121 (a).

[31] OCGA § 46-5-121 (b).

[32] OCGA § 46-5-122 (11) ("9-1-1 charge"), (18) ("wireless enhanced 9-1-1 charge").

[33] *McLeod*, supra at 245 (2).

[34] *State v. City of Port Orange*, 650 S2d 1, 3 (Fla. 1994) (transportation utility fees assessed by a city to finance bonds were a tax rather than user fees), citing *National Cable Television Assn. v. United States*, 415 U. S. 336, 341 (94 SC 1146, 39 LE2d 370) (1974).

[35] Supra.

[36] Supra at 324 (2).

phones for, inter alia, enhanced 9-1-1 services is a tax.[37] The court reasoned that "the surcharge . . . pays for services received by, and for the benefit of, the general public. The benefits flow to the general public because everyone — not just wireless telephone users — benefits from the enhancements to [9-1-1] service."[38] Similarly, in *Bay Area Cellular Telephone Co. v. City of Union City*,[39] a California appeals court ruled that a 9-1-1 charge similar to the one imposed by the Act was a "special tax," not a fee.[40] The court cited as factors that it (1) "inures to the benefit of the public as a whole, not to any particular group within the public," and (2) "is not charged for *use* of the [9-1-1] system, but for *access* to the system, whether or not a resident ever places an emergency call."[41] The court concluded, as we do here, that the 9-1-1 charge "provides revenues to fund a governmental service available to all."[42]

For the same reasons, the United States Comptroller General has determined that the 9-1-1 charge at issue in this case is a tax.

> The monthly charge is adopted by a resolution of the local government and applies to every billed telephone subscriber, without regard to level of service. The [9-1-1] charge raises money that is spent to provide rapid, direct access to public safety agencies for the benefit of the entire community. Thus, the Georgia [9-1-1] tax is a vendee tax.[43]

The County argues that the charge cannot be a tax because it is not enumerated in OCGA § 48-5-220, which lists the purposes for which county taxes may be levied and collected. The County cites no authority for this proposition. "The Georgia Constitution . . . specifically authorizes counties to raise taxes for the exercise of certain enumerated purposes, as well as other public purposes authorized by the General Assembly."[44] Through the Act, the General Assembly authorized local governments to adopt resolutions imposing the

---

[37] *Kessler v. Hevesi*, 846 N.Y.S.2d 56, 57 (N.Y. App. Div. 2007).

[38] Id.

[39] 162 Cal. App. 4th 686 (Cal. Ct. App. 2008).

[40] Id. at 696 (II) (B).

[41] (Citation omitted; emphasis in original.) Id.

[42] Id. at 699 (II) (B).

[43] (Citations omitted.) *Nat. Weather Svc. Ga. 911 Charge*, B-301126, 2003 WL 22416497 (Comp. Gen. 2003); Compare *Dewberry Engraving Co. &c. v. North Shelby County Fire and Emergency Med. District*, 519 S2d 490, 492 (Ala. 1987) (fees charged for fire protection services are not a tax because they are made nonuniformly, depending upon the specific service and/or upon the classification of the property served).

[44] *Peacock v. Ga. Municipal Assn.*, 247 Ga. 740, 742 (2) (279 SE2d 434) (1981). See Ga. Const. of 1983, Art. IX, Sec. II, Par. III (a).

9-1-1 charge,[45] as the County has done in this case. We conclude that the 9-1-1 charge is a tax.

3. The County next argues that T-Mobile may not obtain a refund pursuant to OCGA § 48-5-380 because the statute only applies to ad valorem taxes or license fees. We disagree. Under OCGA § 48-5-380 (b), a taxpayer who has voluntarily or involuntarily paid an allegedly erroneous tax collected by a county may file a claim for a refund from the governing authority. "[T]his procedure applies to *any* tax paid by the taxpayer and is not restricted to ad valorem or other types of taxes."[46] Accordingly, as we have ruled that the 9-1-1 charge is a tax, T-Mobile may use the procedure set out in OCGA § 48-5-380 to obtain a refund. The County's argument fails.

4. The County next argues that T-Mobile's action for a refund of 9-1-1 charges is barred by the voluntary payment doctrine. It is true that, in general, payments voluntarily made are not recoverable.[47] This doctrine does not apply in tax refund actions, however.[48] As we have construed the 9-1-1 charge to be a tax, T-Mobile's action for a refund of taxes is not barred by the voluntary payment doctrine.

5. The County contends that the trial court erred by summarily awarding T-Mobile $101,618.66 as liquidated damages, plus prejudgment interest. These are separate issues, which the County has not framed properly.

(a) The underlying action is one for a tax refund. In such a case, the taxpayer "must prove his true and correct tax liability in order to have a money recovery since the commissioner is *wrongfully* withholding only that amount *in excess* of what the taxpayer owes."[49] Thus, the first issue is whether T-Mobile carried its burden of proving, as a matter of law, that $101,618.66 was the "true and correct" amount of 9-1-1 charges it paid the County on behalf of its prepaid wireless customers during the Refund Period. We conclude that T-Mobile has done so.

In support of its motion for summary judgment, T-Mobile's senior tax manager, Tony Schilens, averred that during the Refund

---

[45] OCGA § 46-5-133 (a).

[46] (Footnote omitted; emphasis in original.) *Atlanta Hospitality Workers v. City of Atlanta*, 247 Ga. App. 650, 652 (2) (545 SE2d 49) (2001).

[47] *Wallis v. B & A Constr. Co.*, 273 Ga. App. 68, 73 (2) (614 SE2d 193) (2005).

[48] *Oxford v. Shuman*, 106 Ga. App. 73, 79 (2) (c) (126 SE2d 522) (1962). Accord *Southstar Energy Svcs. v. Ellison*, 286 Ga. 709, 712 (1) (691 SE2d 203) (2010) (general statute, such as the one codifying the voluntary payment doctrine, does not apply where there is "a specific statute relative to the tax collected") (citation and punctuation omitted); *Nat. Health Network v. Fulton County*, 270 Ga. 724, 726 (1) (514 SE2d 422) (1999) ("the legislature enacted [OCGA] § 48-5-380 to overcome the rule that a taxpayer could not recover a voluntary payment of taxes") (footnote omitted).

[49] (Emphasis in original.) *Hawes v. Shuman*, 123 Ga. App. 543, 549 (1) (181 SE2d 708) (1971) (Hall, P. J., dissenting), reversed, 228 Ga. 101 (184 SE2d 178) (1971) (adopting dissent).

Period, T-Mobile collected $845,815.26 in monthly 9-1-1 charges from its wireless "postpaid" subscribers with a Fulton County billing address and remitted that amount to the County; that it estimated the number of prepaid customers it had in the County and remitted $101,618.66 in monthly 9-1-1 charges on behalf of those customers; and that it sought a refund in the amount of $101,618.66. During discovery, the County propounded the following interrogatory to T-Mobile:

> State in full factual detail the methodology by which you calculated the alleged Refund Amount of $101,618.66. Describe in detail the factual basis for your computation of [that amount], including an itemization of the $947,433.92 in [9-1-1] charges that you contend were paid to [the County] during the Refund Period.

T-Mobile responded with a three-page description of the method by which it allocated the 9-1-1 charges to prepaid wireless customers and monthly wireless "postpaid" customers. T-Mobile submitted a monthly chart of the charges paid to the County during the Refund Period, segregated by prepaid and postpaid customers, as well as 183 pages of supporting documentation. Finally, the County deposed Schilens, who explained the method by which prepaid subscribers were calculated. Schilens testified that, according to his calculations, "the total dollars less the amount that we collected from our postpaid customers leaves us with the amount that was paid from T-Mobile's pocket, which is the same amount that we calculated for the prepaid customer."

> When a motion for summary judgment is made and supported, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.[50]

We conclude that T-Mobile has carried its burden of proving the correct amount owed as a refund,[51] and the County has failed to come

---

[50] (Citation and punctuation omitted.) *Clawson v. Intercat, Inc.*, 294 Ga. App. 624, 627 (1) (669 SE2d 671) (2008).

[51] Compare *Gable Indus. v. Blackmon*, 233 Ga. 542, 546 (212 SE2d 328) (1975) (on motion for rehearing) (taxpayer cannot carry burden of proving its true and correct tax liability "by testimony simply affirming the correctness of the return") (citation and punctuation omitted).

forward with any specific evidence refuting T-Mobile's methodology or calculations, as demonstrated by its documents and testimony. While the County speculates that T-Mobile's calculations are incorrect because it did not bill or obtain personal information regarding its prepaid customers during the Refund Period, "mere speculation, conjecture, or possibility are insufficient to preclude summary judgment."[52]

(b) Second, the County argues that the trial court should not have awarded prejudgment interest to T-Mobile. We disagree. A taxpayer is entitled to recover prejudgment interest on wrongfully collected taxes from the date it demands a refund.[53] This is a tax refund action, and we have determined that the 9-1-1 charge at issue is a tax erroneously paid by T-Mobile. Thus, the trial court properly ruled that T-Mobile is entitled to recover prejudgment interest from the date it demanded a refund from the County.

*Judgment affirmed. Phipps, P. J., and Adams, J., concur.*

DECIDED JULY 30, 2010.

*Jerolyn W. Ferrari, Robert D. Ware,* for appellant.
*Alston & Bird, Timothy J. Peaden, Kristine M. Brown, Clark R. Calhoun,* for appellee.

---

[52] (Citations and punctuation omitted.) *Clay v. Oxendine,* 285 Ga. App. 50, 56 (1) (645 SE2d 553) (2007).

[53] *Eastern Air Lines v. Fulton County,* 183 Ga. App. 891, 892-893 (1) (360 SE2d 425) (1987) (whole court).