[No. H022665. Sixth Dist. June 3, 2002.]

HOWARD JARVIS TAXPAYERS ASSOCIATION et al., Plaintiffs and Appellants, v.
CITY OF SALINAS et al., Defendants and Respondents.

COUNSEL

Timothy J. Morgan; Jonathan M. Coupal and Timothy A. Bittle for Plaintiffs and Appellants.

James C. Sanchez, City Attorney; Richards, Watson & Gershon, Mitchell E. Abbott and Patrick K. Bobko for Defendants and Respondents.

OPINION

**ELIA, J.**—In this "reverse validation" action, plaintiff taxpayers challenged a storm drainage fee imposed by the City of Salinas. Plaintiffs contended that the fee was a "property-related" fee requiring voter approval, pursuant to California Constitution, article XIII D, section 6, subdivision (c), which was added by the passage of Proposition 218. The trial court ruled that the fee did not violate this provision because (1) it was not a property-related fee

and (2) it met the exemption for fees for sewer and water services. We disagree with the trial court's conclusion and therefore reverse the order.

*Background*

In an effort to comply with the 1987 amendments to the federal Clean Water Act (33 U.S.C. § 1251 et seq.; 40 C.F.R. § 122.26(a) et seq. (2001)), the Salinas City Council took measures to reduce or eliminate pollutants contained in storm water, which was channeled in a drainage system separate from the sanitary and industrial waste systems. On June 1, 1999, the city council enacted two ordinances to fund and maintain the compliance program. These measures, ordinance Nos. 2350 and 2351, added former chapters 29 and 29A, respectively, to the Salinas City Code. Former section 29A-3 allowed the city council to adopt a resolution imposing a "Storm Water Management Utility fee" to finance the improvement of storm and surface water management facilities. The fee would be imposed on "users of the storm water drainage system."

On July 20, 1999, the city council adopted resolution No. 17019, which established rates for the storm and surface water management system. The resolution specifically states: "There is hereby imposed on each and every developed parcel of land within the City, and the owners and occupiers thereof, jointly and severally, a storm drainage fee." The fee was to be paid annually to the City "by the owner or occupier of each and every developed parcel in the City who shall be presumed to be the primary utility rate payer . . . ." The amount of the fee was to be calculated according to the degree to which the property contributed runoff to the City's drainage facilities. That contribution, in turn, would be measured by the amount of "impervious area"[1] on that parcel.

Undeveloped parcels—those that had not been altered from their natural state—were not subject to the storm drainage fee. In addition, developed parcels that maintained their own storm water management facilities or only partially contributed storm or surface water to the City's storm drainage facilities were required to pay in proportion to the amount they did contribute runoff or used the City's treatment services.

---

[1]"Impervious Area," according to resolution No. 17019, is "any part of any developed parcel of land that has been modified by the action of persons to reduce the land's natural ability to absorb and hold rainfall. This includes any hard surface area which either prevents or retards the entry of water into the soil mantle as it entered under natural conditions pre-existent to development, and/or a hard surface area which causes water to run off the surface in greater quantities or at an increased rate of flow from the flow present under natural conditions pre-existent to development."

On September 15, 1999, plaintiffs filed a complaint under Code of Civil Procedure section 863 to determine the validity of the fee.[2] Plaintiffs alleged that this was a property-related fee that violated article XIII D, section 6, subdivision (c), of the California Constitution because it had not been approved by a majority vote of the affected property owners or a two-thirds vote of the residents in the affected area. The trial court, however, found this provision to be inapplicable on two grounds: (1) the fee was not "property related" and (2) it was exempt from the voter-approval requirement because it was "related to" sewer and water services.

## Discussion

Article XIII D was added to the California Constitution in the November 1996 election with the passage of Proposition 218, the Right to Vote on Taxes Act. Section 6 of article XIII D[3] requires notice of a proposed property-related fee or charge and a public hearing. If a majority of the affected owners submit written protests, the fee may not be imposed. (§ 6, subd. (a)(2).) The provision at issue is section 6, subdivision (c) (hereafter section 6(c)), which states, in relevant part: "Except for fees or charges for sewer, water, and refuse collection services, no property-related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area."

Section 2 defines a "fee" under this article as a levy imposed "upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property-related service." (§ 2, subd. (e).) A "property-related service" is "a public service having a direct relationship to property ownership." (§ 2, subd. (h).) ▮ The City maintains that the storm drainage fee is not a property-related fee, but a "user fee" which the property owner can avoid simply by maintaining a storm water management facility on the property. Because it is possible to own property without being subject to the fee, the City argues this is not a fee imposed "as an incident of property ownership" or "for a property-related service" within the meaning of section 2.

We cannot agree with the City's position. Resolution No. 17019 plainly established a property-related fee for a property-related service, the management of storm water runoff from the "impervious" areas of each parcel in the

---

[2]Plaintiffs are the Howard Jarvis Taxpayers Association, the Monterey Peninsula Taxpayers Association, and two resident property owners.

[3]All further unspecified section references are to article XIII D of the California Constitution.

City. The resolution expressly stated that "each owner and occupier of a developed lot or parcel of real property within the City, is served by the City's storm drainage facilities" and burdens the system to a greater extent than if the property were undeveloped. Those owners and occupiers of developed property "should therefore pay for the improvement, operation and maintenance of such facilities." Accordingly, the resolution makes the fee applicable to "*each and every developed parcel* of land within the City." (Italics added.) This is not a charge directly based on or measured by use, comparable to the metered use of water or the operation of a business, as the City suggests. (See *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 838 [102 Cal.Rptr.2d 719, 14 P.3d 930] [art. XIII D inapplicable to inspection fee imposed on private landlords; *Howard Jarvis Taxpayers Assn. v. City of Los Angeles* (2000) 85 Cal.App.4th 79 [101 Cal.Rptr.2d 905] [water usage rates are not within the scope of art. XIII D].)

The "Proportional Reduction" clause on which the City relies does not alter the nature of the fee as property related.[4] A property owner's operation of a private storm drain system reduces the amount owed to the City to the extent that runoff into the City's system is reduced. The fee nonetheless is a fee for a public service having a direct relationship to the ownership of developed property. The City's characterization of the proportional reduction as a simple "opt-out" arrangement is misleading, as it suggests the property owner can avoid the fee altogether by declining the service. Furthermore, the reduction is not proportional to the amount of services requested or used by the occupant, but on the physical properties of the parcel. Thus, a parcel with a large "impervious area" (driveway, patio, roof) would be charged more than one consisting of mostly rain-absorbing soil. Single-family residences are assumed to contain, on average, a certain amount of impervious area and are charged $18.66 based on that assumption.

Proposition 218 specifically stated that "[t]he provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Prop. 218, § 5; reprinted at Historical Notes, 2A West's Ann. Cal.Const. (2002 supp.) foll. art. XIII C, p. 38 [hereafter Historical Notes].) ■ We are obligated to construe constitutional amendments in accordance with the natural and ordinary meaning of the language used by the framers—in this case, the voters of California—in a manner that effectuates their purpose in adopting the law. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 244-245 [149 Cal.Rptr. 239, 583 P.2d 1281]; *Arden Carmichael, Inc. v. County of Sacramento* (2000) 93 Cal.App.4th 507, 514-515 [113 Cal.Rptr.2d 248]; *Board of Supervisors v. Lonergan* (1980) 27 Cal.3d 855, 863 [167

---

[4]According to the public works director, proportional reductions were not anticipated to apply to a large number of people.

Cal.Rptr. 820, 616 P.2d 802].) ▮▮▮ To interpret the storm drainage fee as a use-based charge would contravene one of the stated objectives of Proposition 218 by "frustrat[ing] the purposes of voter approval for tax increases." (Prop. 218, § 2.) We must conclude, therefore, that the storm drainage fee "burden[s] landowners *as landowners*," and is therefore subject to the voter-approval requirements of article XIII D unless an exception applies. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles, supra,* 24 Cal.4th at p. 842.)

*Exception for "Sewer" or "Water" Service*

As an alternative ground for its decision, the trial court found that the storm drainage fee was "clearly a fee related to 'sewer' and 'water' services." The exception in section 6(c) applies to fees "for sewer, water, and refuse collection services." Thus, the question we must next address is whether the storm drainage fee was a charge *for* sewer service or water service.

The parties diverge in their views as to whether the reach of California Constitution, article XIII D, section 6(c) extends to a storm drainage system as well as a sanitary or industrial waste sewer system. The City urges that we rely on the "commonly accepted" meaning of "sewer," noting the broad dictionary definition of this word.[5] The City also points to Public Utilities Code section 230.5 and the Salinas City Code, which describe storm drains as a type of sewer.[6]

Plaintiffs "do not disagree that storm water is carried off in storm sewers," but they argue that we must look beyond mere definitions of "sewer" to examine the legal meaning in context. Plaintiffs note that the storm water management system here is distinct from the sanitary sewer system and the industrial waste management system. Plaintiffs' position echoes that of the

---

[5]Webster's Third New International Dictionary, for example, defines "sewer" as "1: a ditch or surface drain 2: an artificial usu. subterranean conduit to carry off water and waste matter (as surface water from rainfall, household waste from sinks or baths, or waste water from industrial works)." (Webster's 3d New Internat. Dict. (1993) p. 2081.) The American Heritage Dictionary also denotes the function of "carrying off sewage or rainwater." (American Heritage College Dict. (3d ed. 1997) p. 1248.) On the other hand, the Random House Dictionary of the English Language (2d ed. 1987) page 1754, does not mention storm or rainwater in defining "sewer" as "an artificial conduit, usually underground, for carrying off waste water and refuse, as in a town or city."

[6]Public Utilities Code section 230.5 defines "Sewer system" to encompass all property connected with "sewage collection, treatment, or disposition for sanitary or drainage purposes, including . . . all drains, conduits, and outlets for surface or storm waters, and any and all other works, property or structures necessary or convenient for the collection or disposal of sewage, industrial waste, or surface or storm waters." Salinas City Code section 36-2, subdivision (31) defines "storm drain" as "a sewer which carries storm and surface waters and drainage, but which excludes sewage and industrial wastes other than runoff water."

Attorney General, who observed that several California statutes differentiate between management of storm drainage and sewerage systems.[7] (81 Ops.Cal.Atty.Gen. 104, 106 (1998).) Relying extensively on the Attorney General's opinion, plaintiffs urge application of a different rule of construction than the plain-meaning rule; they invoke the maxim that "if a statute on a particular subject omits a particular provision, inclusion of that provision in another related statute indicates an intent [that] the provision is not applicable to the statute from which it was omitted." (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1827 [46 Cal.Rptr.2d 198].) Thus, while section 5, which addresses assessment procedures, refers to exceptions specifically for "*sewers*, water, flood control, [and] *drainage systems*" (italics added), the exceptions listed in section 6(c) pertain only to "sewer, water, and refuse collection services." Consequently, in plaintiffs' view, the voters must have intended to exclude drainage systems from the list of exceptions to the voter-approval requirement.

The statutory construction principles invoked by both parties do not assist us. The maxim proffered by plaintiffs, "although useful at times, is no more than a rule of reasonable inference" and cannot control over the lawmakers' intent. (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 350 [45 Cal.Rptr.2d 279, 902 P.2d 297]; *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 991 [73 Cal.Rptr.2d 682, 953 P.2d 858].) On the other hand, invoking the plain-meaning rule only begs the question of whether the term "sewer services" was intended to encompass the more specific sewerage with which most voters would be expected to be familiar, or all types of systems that use sewers, including storm drainage and industrial waste. The popular, nontechnical sense of sewer service, particularly when placed next to "water" and "refuse collection" services, suggests the service familiar to most households and businesses, the sanitary sewerage system.

We conclude that the term "sewer services" is ambiguous in the context of both section 6(c) and Proposition 218 as a whole. We must keep in mind, however, the voters' intent that the constitutional provision be construed liberally to curb the rise in "excessive" taxes, assessments, and fees exacted

---

[7]For example, Government Code section 63010 specifies "storm sewers" in delimiting the scope of " '[d]rainage,' " while separately identifying the facilities and equipment used for " '[s]ewage collection and treatment.' " (Gov. Code, § 63010, subd. (q)(3), (10).) Government Code section 53750, part of the Proposition 218 Omnibus Implementation Act, explains that for purposes of articles XIII C and article XIII D " '[d]rainage system' " means "any system of public improvements that is intended to provide for erosion control, landslide abatement, or for other types of water drainage." Health and Safety Code section 5471 sets forth government power to collect fees for "services and facilities . . . in connection with its water, sanitation, storm drainage, or sewerage system."

by local governments without taxpayer consent. (Prop. 218, §§ 2, 5; reprinted at Historical Notes, *supra*, p. 38.) Accordingly, we are compelled to resort to the principle that exceptions to a general rule of an enactment must be strictly construed, thereby giving "sewer services" its narrower, more common meaning applicable to sanitary sewerage.[8] (Cf. *Estate of Banerjee* (1978) 21 Cal.3d 527, 540 [147 Cal.Rptr. 157, 580 P.2d 657]; *City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005 [20 Cal.Rptr.2d 658].)

The City itself treats storm drainage differently from its other sewer systems. The stated purpose of ordinance No. 2350 was to comply with federal law by reducing the amount of pollutants discharged into the storm water, and by preventing the discharge of "non-storm water" into the storm drainage system, which channels storm water into state waterways. According to John Fair, the public works director, the City's storm drainage fee was to be used not just to provide drainage service to property owners, but to monitor and control pollutants that might enter the storm water before it is discharged into natural bodies of water.[9] The Salinas City Code contains requirements addressed specifically to the management of storm water runoff.[10] (See, e.g., Salinas City Code, §§ 31-802.2, 29-15.)

For similar reasons we cannot subscribe to the City's suggestion that the storm drainage fee is "for . . . water services." Government Code section 53750, enacted to explain some of the terms used in articles XIII C and XIII D, defines " '[w]ater' " as "any system of public improvements intended to provide for the production, storage, supply, treatment, or distribution of water." (Gov. Code, § 53750, subd. (m).) The average voter would envision "water service" as the supply of water for personal, household, and commercial use, not a system or program that monitors storm water for pollutants, carries it away, and discharges it into the nearby creeks, river, and ocean.

We conclude that article XIII D required the City to subject the proposed storm drainage fee to a vote by the property owners or the voting residents of

---

[8]Sanitary sewerage carries "putrescible waste" from residences and businesses and discharges it into the sanitary sewer line for treatment by the Monterey Regional Water Pollution Control Agency. (Salinas City Code, § 36-2, subd. (26).)

[9]Resolution No. 17019 defined "Storm Drainage Facilities" as "the storm and surface water sewer drainage systems comprised [*sic*] of storm water control facilities and any other natural features [that] store, control, treat and/or convey surface and storm water. The Storm Drainage Facilities shall include all natural and man-made elements used to convey storm water from the first point of impact with the surface of the earth to a suitable receiving body of water or location internal or external to the boundaries of the City. . . ." The "storm drainage system" was defined to include pipes, culverts, streets and gutters, "storm water sewers," ditches, streams, and ponds. (See also Salinas City Code, former § 29-3, subd. (l) [defining "storm drainage system"].)

[10]Storm water under ordinance No. 2350 includes "stormwater runoff, snowmelt runoff, and surface runoff and drainage." (Salinas City Code, former § 29-3, subd. (dd).)

the affected area. The trial court therefore erred in ruling that ordinance Nos. 2350 and 2351 and Resolution No. 17019 were valid exercises of authority by the city council.

## *Disposition*

The judgment is reversed. Costs on appeal are awarded to plaintiffs.

Premo, Acting P. J., and Mihara, J., concurred.

A petition for a rehearing was denied July 2, 2002, and respondents' petition for review by the Supreme Court was denied August 28, 2002.