MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2017 ME 204
Docket:      BCD-17-15
Argued:      September 12, 2017
Decided:     October 10, 2017

Panel:       SAUFLEY C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE et al.

v.

BIDDEFORD INTERNET CORPORATION

ALEXANDER, J.

[¶1]  Biddeford Internet Corporation, doing business as Great Works Internet (GWI), appeals, and the State of Maine and the ConnectME Authority cross-appeal, from an amended judgment entered in the Business and Consumer Docket (*Horton, J.*) awarding the State and the Authority $406,852 in unpaid fees pursuant to 35-A M.R.S. § 9216 (2014).[1]  On appeal, all parties argue that the court erred by concluding that the section 9216 assessment was a valid business excise tax.  GWI contends that the assessment constitutes either an invalid business excise tax or an unconstitutional property tax.  The

---

[1]  Title 35-A M.R.S. § 9216 was enacted by P.L. 2009, ch. 612, § 10 (emergency, effective Apr. 6, 2010) (codified at 35-A M.R.S. § 9216 (2014)), and has since been amended by P.L. 2015, ch. 151, §§ 1-2, and ch. 284, § 10 (effective Oct. 15, 2015) (codified at 35-A M.R.S. § 9216 (2016)). Unless otherwise noted, references to section 9216 in this opinion are to the statute as originally enacted and in effect from April 6, 2010, to October 14, 2015.

2

State and the Authority contend that the assessment is not a tax but rather a fee.[2] We agree with the State and the Authority that the Legislature properly characterized this assessment as a fee, and, with that clarification, we affirm the judgment.

## I. CASE HISTORY

[¶2]  After a non-jury trial, the court made the following findings, which are supported by competent evidence in the record.

[¶3]  The Legislature established the Authority "to stimulate investment in advanced communications technology infrastructure" and to expand the availability of broadband service in unserved or underserved areas in Maine. P.L. 2005, ch. 665, § 3 (effective Aug. 23, 2006) (codified at 35-A M.R.S. § 9203 (2014)); *see also* 35-A M.R.S. §§ 9202, 9202-A, 9204 (2014).[3]

[¶4]  In 2009, private telecommunications service providers began meeting with representatives of the State, including the Authority, to address the lack of broadband capacity in Maine.  Broadband involves the

---

[2]  The parties make additional arguments in their appeals.  GWI challenges the court's determination that the State and the Authority had standing to bring an action to collect the unpaid fees and argues that section 9216 violates its rights to due process and equal protection.  The State contends that GWI lacks standing to assert its equal protection claim.  We are not persuaded by these arguments and do not address them further.

[3]  These statutes have since been amended, or repealed and replaced, by P.L. 2015, ch. 284, §§ 2-7 (effective Oct. 15, 2015) (codified at 35-A M.R.S. § 9202 to 9204-A (2016)).

transmission of data—generally associated with the internet—through both fiber optic and digital subscriber line (DSL) technology, among other means. Fiber optic transmission is currently the fastest means of data transmission and is accomplished via optical fiber cable, which is essentially a group of plastic or glass strands that can carry light pulses to transmit data. The term "dark fiber" applies to the unlit fiber optic strands within a cable. Dark fiber providers lease or sell strands of dark fiber to telecommunications service providers who then use, "light," the strands to transmit data for their customers.

[¶5] During the meetings involving the State, the Authority, and private telecommunications service providers, an initiative, called the "Three Ring Binder," was developed to serve as a new route for fiber optic cable in unserved and underserved areas. The purpose of the project was to put dark fiber in areas where there was no dark fiber at all.

[¶6] GWI, one of the telecommunications service providers that participated in the meetings, applied for a federal grant to subsidize construction of the Three Ring Binder. The application required GWI to assign the project to a new entity, Maine Fiber Company, Inc., that would own the Three Ring Binder and be responsible for its construction. Maine Fiber would

make the Three Ring Binder available on an "open access" basis so that any telecommunications service provider could purchase or lease dark fiber to extend service to its residential or business customers.

[¶7] The grant was approved in December 2009 in the amount of $25,402,904.[4] The grant required GWI to transfer the right to receive the funds to Maine Fiber and required Maine Fiber to complete construction of the Three Ring Binder within three years. Maine Fiber now holds title to the Three Ring Binder, which was completed in 2012, and is a "dark fiber provider" within the meaning of 35-A M.R.S. § 102(4-A) (2014) and section 9216.

[¶8] When Maine Fiber was created, it lacked legal authority to attach dark fiber and equipment to utility poles that were owned by other entities and to construct the Three Ring Binder within public rights of way. Because of the narrow timeline for completion of the project, emergency legislation was introduced to provide Maine Fiber the necessary authority to build the Three Ring Binder. *See* L.D. 1778 (124th Legis. 2009).

[¶9] In February 2010, the Legislature held a public hearing at which GWI, Maine Fiber, and the Authority testified in favor of L.D. 1778. FairPoint

---

[4] The grant provided eighty percent of the cost for construction but required a twenty percent match from private individuals or entities.

Communications, the largest provider of dark fiber and telephone service in Maine, opposed the legislation, asserting that the Three Ring Binder would overbuild the existing network. A working group was formed to reach a compromise that would be agreeable to both sides.

[¶10] The resulting compromise granted pole attachment rights and the right to construct within the public rights of way to Maine Fiber and authorized a dedicated broadband sustainability fund, supported by a broadband sustainability fee (BSF) to be collected from users of the Three Ring Binder. The purpose of the BSF was two-fold: to support improvements to expand broadband access, and to reduce the competitive advantage to those utilizing federally supported dark fiber over those who had expanded broadband and dark fiber access using private resources. Although GWI was not part of the working group, it did not oppose the agreement reached.

[¶11] The Legislature amended L.D. 1778, which was later codified at 35-A M.R.S. § 9216. *See* House Amend. B to Comm. Amend. A to L.D. 1778, No. H-807 (124th Legis. 2009).

[¶12] Section 9216(2) imposed the BSF on any entity that leased, purchased, or otherwise obtained federally supported dark fiber from Maine Fiber. *See* 35-A M.R.S. § 102(4-B) (2014). Maine Fiber was required to collect

the BSF from those entities and to remit the collected amounts to the Authority. *Id.* § 9216(3). The Authority was required to deposit five percent of the funds received into the ConnectME Fund, which was used to support its activities pursuant to sections 9204 and 9216. *Id.* § 9216(4)(A). The remaining ninety-five percent was deposited into the broadband sustainability fund. *Id.* § 9216(4)(B). Pursuant to the statute, certain carriers, including FairPoint, received a right of first refusal to use the broadband sustainability fund to finance the deployment of broadband infrastructure in unserved or underserved areas within the carrier's service territory. *Id.* § 9216(6). Any remaining money in the broadband sustainability fund was then transferred to the ConnectME Fund. *Id.*

[¶13] In 2015, the Legislature repealed the statute creating the BSF, which otherwise would have expired on December 31, 2017. *See* P.L. 2015, ch. 151, §§ 1-2 (effective Oct. 15, 2015) (codified at 35-A M.R.S. § 9216 (2016)).

[¶14] Since 2010, GWI has accessed and utilized dark fiber in the Three Ring Binder. The terms under which Maine Fiber granted GWI access to the Three Ring Binder were stated in a series of Dark Fiber Use Agreements (DFUAs). In the parties' original DFUA, GWI expressly agreed that it "shall be

responsible for any taxes or fees . . . including . . . the 'broadband sustainability fee.'" Although GWI and Maine Fiber amended the DFUA several times and later entered into a Dark Fiber Use and Settlement Agreement, the provision regarding GWI's responsibility for paying any taxes or fees, including the BSF, remained intact.

[¶15] From approximately May 2010 until May 2012, while the Three Ring Binder was being constructed, GWI paid approximately $15,000 of the BSF to Maine Fiber. GWI then stopped paying the BSF but did not reduce the fees charged to its customers to reflect the amount it saved by the nonpayment of the BSF. Calculated from when GWI stopped paying the BSF in June 2012 until the statute's repeal in October 2015, the total amount of fees collected but not paid by GWI was $406,852.[5]

[¶16] On September 9, 2014, the State and the Authority filed a complaint against GWI in the Superior Court (Kennebec County) to collect the unpaid fees. The case was subsequently transferred to the Business and Consumer Docket. The court held a non-jury trial on April 27-28, 2016.

[¶17] By a judgment entered on October 5, 2016, the court awarded the State and the Authority $406,852 in unpaid fees, concluding that the State and

---

[5] Maine Fiber billed the BSF to every entity—approximately two dozen broadband service providers—that purchased, leased, or licensed dark fiber from Maine Fiber as required by the statute, but GWI was the only entity that did not pay the BSF as required.

the Authority had standing to sue GWI directly, that section 9216 did not violate GWI's constitutional rights to due process and equal protection, and that the BSF was a valid business excise tax rather than a fee.

[¶18] GWI timely filed motions for additional findings of fact and to alter or amend the judgment. *See* M.R. Civ. P. 52(b), 59(e). After a hearing, the court issued an amended decision and judgment, but otherwise denied GWI's motions. GWI appealed, and the State and the Authority cross-appealed.

[¶19] GWI argues that, while the court correctly determined that the BSF is a tax rather than a fee, the court erred in concluding that the BSF is a valid business excise tax rather than a property tax that violates Me. Const. art IX, § 8. The State and the Authority agree with the court's award, but argue that the court erred in concluding that the BSF is a tax rather than a fee.

## II. LEGAL ANALYSIS

[¶20] We review questions of law de novo. *Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 7, 17 A.3d 667. "Because both a fee and a tax raise monies for governmental use, the distinction between the two is one of purpose and of degree of particularity." *Butler v. Supreme Judicial Court*, 611 A.2d 987, 990 (Me. 1992). When determining whether an assessment is a fee or a tax, we consider four factors: (1) whether the primary purpose is to

raise revenue or to further regulatory goals, (2) whether the assessment is paid in exchange for benefits not received by the general public, (3) whether the assessment is voluntary, and (4) whether the assessment is a fair approximation of the cost to the government and of the benefit to the party. *See id.*; *City of Lewiston v. Gladu,* 2012 ME 42, ¶¶ 12-26, 40 A.3d 964. In reviewing an assessment, we will respect the Legislature's characterization of an assessment, unless that characterization is inconsistent with the law.

[¶21] Regarding the first factor, we have recognized that fees can be used to fund the construction of capital improvements and infrastructure when that construction supports recognized regulatory goals. *See Gladu*, 2012 ME 42, ¶¶ 15-16, 40 A.3d 964. Here, section 9216 required that ninety-five percent of the BSFs remitted to the Authority be deposited into the broadband sustainability fund to support the regulatory goal of expansion of broadband infrastructure into unserved and underserved areas. Thus, nearly all of the collected fees were used to further the specific regulatory goals defined in section 9202-A and to carry out the Authority's regulatory duties as defined in section 9204(2).

[¶22] As to the second factor, the BSF provided both direct and indirect benefits to GWI as a user of the Three Ring Binder. The expansion of

broadband infrastructure funded by the BSF benefitted GWI by providing access to more potential customers of its services. *See Gladu,* 2012 ME 42, ¶ 12, 40 A.3d 964 ("[A]lthough some jurisdictions have held that benefits must be direct and exclusive[,] the trend seems to be in favor of upholding fees that confer intangible benefits on both those who are assessed and those who are not." (alteration omitted)). Furthermore, GWI requested and Maine Fiber agreed to build the initial segments of the Three Ring Binder in locations that would benefit GWI's important commercial customers—a request that uniquely benefited GWI.

[¶23] Turning to the third factor, we observed in *Butler* that fees are voluntary "in the sense that an individual may avoid the charge by choosing not to utilize the service." 611 A.2d at 990. In *Gladu*, we also stated that "[t]he fact that the costs of avoiding [an] assessment are quite high does not make the assessment involuntary." 2012 ME 42, ¶ 23, 40 A.3d 964. Here, the Three Ring Binder was available on an open access basis, and GWI's decision to use it was voluntary.

[¶24] Finally, an assessment need be only a "fair approximation" of the respective cost to the government or the benefit to the party to be considered a fee. *Id.* ¶ 24. Here, only five percent of the collected fees were used to

defray the costs incurred by the Authority in implementing section 9216, but in return GWI and its customers received significant tangible and intangible benefits from the BSF.

[¶25]  After evaluating all four factors, we conclude that the Legislature properly characterized the BSF as a fee and not a tax.  Accordingly, the arguments advanced by GWI asserting that the BSF is a tax fail, as do GWI's arguments that there is some inequity in utilizing the BSF to support further broadband expansion and to level the playing field with providers that have supported broadband expansion with their own and their customers' resources rather than relying on the federal subsidy.  Although the trial court erred in concluding that the assessment was a tax, the error is harmless because, whatever the assessment may be called, GWI is required to pay it.  Therefore, after recognizing that the assessment is a fee, we affirm the decision of the Superior Court awarding the State and the Authority $406,852 in unpaid fees, plus interest and costs.

The entry is:

Judgment affirmed.

12

David P. Silk, Esq., Benjamin M. Leoni, Esq. (orally), and Rebecca Gray Klotzle, Esq., Curtis Thaxter LLC, Portland, for appellant Biddeford Internet Corporation

Janet T. Mills, Attorney General, and Thomas A. Knowlton, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for cross-appellants State of Maine and ConnectME Authority

Business and Consumer Docket docket number CV-2014-56
FOR CLERK REFERENCE ONLY